UNITED STATES

v.

**Andrew MITCHELL, Jr., 459–31–7144, Aviation Boatswain's Mate (Launching and Recovery Equipment) Second Class (E–5), U.S. Navy.**

**NMCM 92 1933.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 17 June 1992.

Decided 24 May 1993.

Appellate Defense Counsel: LT Alice B. Lustre, JAGC, USNR.

Appellate Government Counsel: Capt Laulie S. Powell, USMC.

Amicus Curiae: Members Opposed to the Maltreatment of Servicemembers, Richard T. McNeil.

## OPINION OF THE COURT EN BANC

LARSON, Chief Judge:

Pursuant to his pleas, the appellant was convicted by special court-martial of wrongful disposal of military property, theft of military property, and two instances of indecent behavior, in violation of Articles 108, 121, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 908, 921, and 934, respectively. He was sentenced by the military judge, sitting alone, to reduction to pay grade E–1, forfeiture of $500 pay per month for 4 months, and a bad-conduct discharge. The sentence was approved by the convening authority.

On appeal, the appellant asserts that he cannot receive a fair and impartial review by an independent appellate court, as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution.[1] His challenge to the independence of this Court is based on the fact that the performance and conduct of the military appellate judges assigned to the Court are evaluated in Navy and Marine Corps fitness reports signed by the Judge Advocate General of the Navy (JAG). Because the JAG, as a senior official within the Department of the Navy, is responsible to the Secretary of the Navy for the efficient and effective administration of military justice in the Navy and Marine Corps, the appellant argues that the JAG has a vested interest in appellate decisions which preserve court-martial convictions and sentences; therefore, appellate judges risk professional adversity by issuing contrary opinions.

Appellant concedes at the outset that this attack is totally systemic in nature. He offers no evidence that the fitness report process has been used to influence any appellate judge assigned to review his case or that any judge has actually been affected by the latent threat of such use. Yet, he asserts that the mere existence of the threat—when coupled with the significance of a fitness report to a commissioned officer's career—creates an untenable conflict of interests that necessarily undermines the Court's independence. Recognizing our inability to fix the fitness report process itself in a manner that would guarantee the Court's independence, he asks that we take no action on the findings and sentence in his case and that it (and, presumably, every case pending review by the Court) be returned to the JAG for referral to an "independent court" until appropriate officials in the Department of the Navy free the judges of this Court from this limitation on their independence.

We hold that the JAG's preparation of fitness reports for the judges of this Court does not violate the appellant's constitutional right to have his appeal decided by an independent appellate court.[2] However, because of the fundamental nature of this attack on the integrity of the military justice system, it merits further discussion.

---

1. The appellant assigns two other errors attacking the jurisdiction of his court-martial on the bases that the military judge is not guaranteed a fixed term of office and was not appointed to his position in accordance with the Appointments Clause of the U.S. Constitution. These systemic attacks on the military justice system have been resolved adversely to the appellant in prior decisions and will not be addressed. *United States v. Weiss*, 36 M.J. 224 (C.M.A.1992); *United States v. Graf*, 35 M.J. 450 (C.M.A.1992).

2. The appellant's right to appellate review derives from statute, not the Constitution. Article 66(b), UCMJ, 10 U.S.C. § 866(b). However, once that right to appellate review is granted, the Due Process Clause of the Fifth Amendment requires that it be accomplished by an *independent* judicial body. *Graf.*

## BACKGROUND [3]

Fitness reports are required for all commissioned officers in the Department of the Navy. This requirement is imposed by Article 1129 of Navy Regulations, which are issued pursuant to 10 U.S.C. § 6011 and have the force of law. *See Cafeteria and Restaurant Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Fitness reports are submitted annually and on certain other specified occasions, such as transfer. In the Navy, the fitness report requirement is implemented by Naval Military Personnel Command Instruction (NAVMILPERSCOMINST) 1611.1A of 26 March 1990, Subj: Reports on the Fitness of Officers, and in the Marine Corps by Marine Corps Order (MCO) P1610.7 of 6 November 1985, Subj: Performance Evaluation System. The latter specifically directs that reports for Marine judges comply with instructions of the JAG in addition to the policies in the Marine Corps order itself. Both directives stress the importance of the fitness report for promotion, retention, and assignment of the officer concerned. In addition, both entitle the officer concerned to review his report and, if he is dissatisfied with its contents, to submit a statement to that effect.

The fitness reports for Navy and Marine Corps officers serve not only to assess an officer's performance and conduct during the past reporting period, but also to identify his value to the Department of the Navy for the future. Although the primary function of these reports is to identify those officers best qualified to meet the leadership and technical needs of the Nation's sea services, another significant purpose is to inform the officer concerned of his deficiencies and areas where he can improve. Both directives require that the officer be counseled if his report is adverse in any category of evaluation. Both Navy and Marine Corps reports require evaluation in several key areas of performance,

including some arguably relevant to this issue, such as loyalty (USMC), cooperation (USMC), organizational support (USN), working relations (USN), and judgment (both).

In addition, both fitness report directives identify the officer responsible for the submission of the report—the "reporting senior"—as the next officer senior to the evaluated officer in the chain of command who is specifically authorized by the controlling directives to submit the report. For this Court's judges, that officer has been the JAG. Judge Advocate General Instruction 5400.1A of 6 July 1992, Subj: Office of the Judge Advocate General (OJAG) Organization Manual, § 109. For Marine judges, there is an additional participant in the fitness report process, called the "reviewing officer," who is required to review the reporting senior's submission for consistency, accuracy, lack of bias, and adherence to Marine Corps fitness report policy. MCO P1610.7. For the three Marine judges on this Court, that officer has, in recent times, been the Assistant Commandant of the Marine Corps.

Another requirement of both fitness report directives is comparison rankings with similarly evaluated officers of the same pay grade in the same organization. All presently assigned appellate judges are in pay grade 0–6. Consequently, the five existing Navy appellate judges (excluding the Chief Judge) are ranked against each other. Because of his additional administrative duties, the Chief Judge is ranked against no other officer. Marine appellate judges are ranked against other Marine Corps colonels for whom the JAG is the reporting senior. For each of the three Marine judges currently assigned, this group includes the other two Marine judges and the Assistant Judge Advocate General for Military Justice ("AJAG").

---

**3.** The details in this background are included to provide an adequate factual record on which to decide this issue. The factual matter described above was developed at the appellate stage, pursuant to our fact-finding powers under Article 66(c), UCMJ, through a combination of discovery and disclosure as well as judicial notice of commonly known regulations and practices in the Department of the Navy. Unless otherwise indicated, the details of fitness report preparation and the identity of the participants in the process pertain to the most recent annual fitness report cycle for Navy captains and Marine Corps colonels, which ended 31 July 1992.

Recommended fitness reports for appellate judges are routinely prepared by the AJAG, or by his principal assistant, for submission to the JAG for review and signature. The JAG has the sole discretion to accept, modify, or reject the recommendations. Each judge has been afforded the opportunity to provide information and comments for incorporation into his report before its preparation.

Because the AJAG fills a significant role in the preparation of the judges' fitness reports, an explanation of his duties is in order. He is generally responsible to the JAG for performance of the JAG's military justice duties under the UCMJ, the Manual for Courts–Martial (MCM), and Judge Advocate General Instruction 5800.7C of 3 October 1990 (JAGMAN). OJAG Organization Manual, § 107. In this capacity he supervises the Director, Criminal Law Division, and is responsible for that officer's performance of his duties. *Id.* The duties of the Director, Criminal Law Division, include drafting legal and policy advice for the JAG on military justice matters; reviewing legislative and regulatory proposals affecting military justice; reviewing all decisions of military appellate courts for systemic malfunction; staffing JAG certification of issues for appellate review; and providing timely guidance to all military justice practitioners in the Department of the Navy. *Id.* The AJAG also serves as the Officer-in-Charge, Navy–Marine Corps Appellate Review Activity (NAMARA). In that capacity, he is responsible to the JAG for the administrative processing of courts-martial under Articles 66, 67, 69 and 73, UCMJ. This general responsibility includes, *inter alia,* receiving cases from the field and preparing them for review by this Court and by the Court of Military Appeals; issuing mandates and orders directed by the appellate courts; and supervising appellate counsel for the appellants and the Government.

Having stated the relevant circumstances, we now consider whether the JAG's preparation of the appellate judges' fitness reports (including the manner in which they are prepared) violates the appellant's right to have his case reviewed by a fair and impartial, i.e., an independent, appellate court. This process begins with an examination of this Court's status as an "independent" court.

## JUDICIAL INDEPENDENCE

The right to have one's case heard before a fair and impartial judicial body as a matter of constitutional due process is firmly established in the law. *In Re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). That right has been specifically recognized as applicable to members of the armed forces at courts-martial. *United States v. Graf,* 35 M.J. 450 (C.M.A.1992). It applies with equal force to review of those courts-martial by a fair and impartial appellate court. *Id.* A fair and impartial court must be an independent court, for no judge can be fair and impartial if he has to answer to another for his judicial decisions. In fact, so intrinsic in the fairness of our system of law is the concept of an "independent court" that the first of those two words is really redundant.

Congress recognized the importance of a professional, independent judiciary in the Military Justice Act of 1968, Pub.L. No. 90–632, §§ 2(9) and 2(27), 82 Stat. 1336–37, 1341 (Oct. 24, 1968), which established, *inter alia,* military judges for general courts-martial under the direct control of the JAG. The significance of this creation was made clear in *United States v. Moorehead,* 20 U.S.C.M.A. 574, 44 C.M.R. 4 (1971), where the Court found that the Coast Guard's practice of detailing a judge advocate whose primary duty was not judging to sit as a general court-martial military judge violated congressional intent in Article 26(c), UCMJ, to establish a full-time, independent judiciary. *See also United States v. Beckermann,* 27 M.J. 334 (C.M.A.1989) (applying *Moorhead* to disapprove the assignment of an officer to temporary duty for a fixed period of time as military judge for general courts-martial).

The same Act redesignated the "boards of review" under Article 66, UCMJ, as "Courts of Military Review" and the "members" of the new court as "appellate mili-

tary judges." Although the boards of review had been functioning as appellate judicial tribunals since the enactment of the UCMJ in 1950, *United States v. Lanford,* 6 U.S.C.M.A. 371, 20 C.M.R. 87 (1955), the redesignation in the 1968 Act was more than just a symbolic gesture. It was designed "to improve and enhance the stature and independent status of these appellate bodies." S.Rep. No. 1601, 90th Cong., 2d Sess. 15, *reprinted in* 1968 U.S.C.C.A.N. 4515. The Act also granted the Chief Judge the authority to assign other appellate judges to panels and to designate them as senior judges, and removed the Court from the Office of the JAG. There is no explanation for these specific provisions in the legislative history of the Act. Nevertheless, it is reasonable to infer that they were included to create a separate judicial body, apart from the JAG's immediate staff, with responsibility for day-to-day administration assigned to the Chief Judge rather than the JAG. This explanation is consistent with the overall objective of enhancing the independence of the Court.

If any doubt as to the independent status of the Court lingered after the 1968 Act, the Court of Military Appeals resolved it in *United States Navy–Marine Corps Court of Military Review v. Carlucci,* 26 M.J. 328 (C.M.A.1988). In that case, the Court ordered the Inspector General of the Department of Defense not to proceed with an investigation into an anonymous allegation that this Court's judges had been improperly influenced in their appellate review of a particularly controversial case. Such an investigation threatened the independence and integrity of this Court because it intended to explore its deliberative processes. *Id.* at 336–37. The opinion made specific reference to the binding authority of the Canons of Judicial Conduct on the judges of this Court, the first of which requires judges to uphold the independence and integrity of their courts. ABA Code of Judicial Conduct, Canon 1. The Court concluded that the proper course of action to resolve the allegation of judicial misconduct in that case would be to appoint a judicial commission to investigate—a procedure similar to that authorized by 28 U.S.C. § 372(c) for investigations of federal judges, and to the remedy suggested by the Court of Military Appeals, itself, 12 years earlier in *United States v. Ledbetter,* 2 M.J. 37, 43 (C.M.A.1976) (allegation of an attempt by the JAG to influence a trial judge).[4] Following *Carlucci,* Congress added Article 6a to the UCMJ, which authorized the President to establish procedures for the investigation of allegations pertaining to the fitness of military judges to perform their duties. This amendment is merely the latest expression of congressional intent to preserve the independence of the judiciary.

## JUDICIAL ACCOUNTABILITY

To conclude, as we do emphatically, that appellate military judges must be independent in their judicial decision-making capacity is not to say that they are not accountable for their performance and behavior. This concept of accountability is not foreign to our civilian brethren. Every state in the Union has a procedure for investigating and resolving complaints against judges. *See Matter of Certain Complaints Under Investigation By An Investigating Committee of the Judicial Council of the Eleventh Circuit (Matter Under Investigation),* 783 F.2d 1488, 1507 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). Even federal judges, whose independence has more safeguards than virtually any other judicial creature (e.g., life tenure), are subject to impeachment by the Senate for "high crimes and misdemeanors," *see* U.S. Const. art. I, § 3, and art. II, § 4, and administrative control by a circuit judicial council for inability or unwillingness to carry out judi-

---

**4.** The Court suggested that an investigation by the JAG would have been an acceptable alternative, had he been inclined to conduct one in that case. *Carlucci,* 26 M.J. at 341 n. 14. Rule for Courts–Martial 109(a) specifically authorizes the JAG to establish procedures to govern the professional supervision and discipline of military appellate judges. *See United States v. Mabe,* 33 M.J. 200 (C.M.A.1991) and *United States v. Rojas,* 17 M.J. 154 (C.M.A.1984), for examples of these procedures in use at the trial and appellate levels, respectively.

cial duties, 28 U.S.C. § 332. Exercise of the judicial council's statutory authority may amount to virtual elimination of a federal judge's caseload. *Chandler v. Judicial Council,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1969).

Similarly, administrative law judges ("ALJs"), who, like military judges, are not appointed under Article III of the Constitution, are accountable to their agency head for compliance with administrative and procedural requirements. *See Nash v. Califano,* 613 F.2d 10 (2d Cir.1980) (case holding limited to questions of jurisdiction and standing but contains insight into administrative controls and limitations of agency vis-a-vis ALJs); *Social Sec. Admin. v. Burris,* 39 M.S.P.R. 51 (M.S.P.B.1988) (insubordination and disruptive behavior constitute "good cause" for removal of ALJ under 5 U.S.C. § 7521).

Accountability as a feature of judicial life is even more evident for military judges. Every appellate judge on this Court took an oath as an officer in the Navy or Marine Corps long before he assumed his position on the appellate bench. Accountability for performance of duty by officers has been a cornerstone of the sea services since this Nation was founded. Traditionally, an officer's duty to account increases as he rises in grade because the extent of his responsibility increases as well. Practitioners of military justice know full well the principle of accountability for one's actions or failures to act, for it has often been tested through trial by court-martial. *See United States v. Grow,* 3 U.S.C.M.A. 77, 11 C.M.R. 77 (1953); *United States v. Lawson,* 33 M.J. 946 (N.M.C.M.R.1991), *aff'd,* 36 M.J. 415 (C.M.A.1993); *United States v. Sievert,* 29 C.M.R. 657 (N.B.R.1958); *United States v. Levy,* 39 C.M.R. 672 (A.B.R.1968).

As officers—indeed, as senior officers—military appellate judges cannot use the black robes of the bench as a shield against professional accountability. For example, it cannot be gainsaid that a lazy judge or one who willfully violates the Canons of Judicial Conduct or uses intemperate language should be held to account for his deficiencies notwithstanding his decisional independence. Chief Judge Everett observed in *Carlucci* that the failure of a military judge to abide by the Canons may even subject him to a charge of dereliction of duty under Article 92, UCMJ, and possible trial by court-martial as a result. 26 M.J. at 336.

Yet, if this fundamental principle of military life is to coexist in peaceful harmony with the equally fundamental principle of judicial independence, one cannot be used to subvert the other. A crucial feature of the statutory/regulatory schemes by which civilian judges are held accountable is protection of the *decisional* independence of the judge—as opposed to his administrative responsibilities and professional conduct. *Nash v. Califano,* 613 F.2d at 15; *Matter Under Investigation,* 783 F.2d at 1508. This feature must obviously be an integral part of any method of accountability for military judges as well, if congressional intent that they be independent is to be honored. *Carlucci.* A significant procedural safeguard to preserve judicial independence, at least for Article III judges, is investigation of misconduct and incompetence by a judicial body. *Matter Under Investigation,* 783 F.2d at 1508. For judges created by acts of Congress under Article I of the Constitution, investigative and disciplinary authority is generally granted to an official of the Executive Department, e.g., an agency head for ALJs, as noted above. *See Territorial Court of the Virgin Islands v. Richards,* 847 F.2d 108 (3d Cir.1988). Similarly, for military judges, Congress expressly granted this authority to the President in Article 6a, UCMJ, who, in turn, has delegated it to the JAG. Rule for Courts–Martial (R.C.M.) 109. Regardless of where such authority is placed, it is clear in every case that it is not to be used to subvert the decisional independence of the judiciary.

So, the question is not whether the military judges assigned to this Court are accountable for their performance and behavior; it is whether the means used to hold us accountable tends to subvert our independence. Before we answer that question, it is appropriate to examine the role of the officer who holds us accountable—the

Judge Advocate General—as well as the principal means he uses to do so—the fitness report.[5]

## THE JUDGE ADVOCATE GENERAL

The JAG is a creation of federal statute, 10 U.S.C. § 5148, which assigns him responsibility for "legal matters" in the Department of the Navy as well as those specific duties assigned him under the Uniform Code of Military Justice. Under Navy Regulations, he is assigned to the Office of the Secretary of the Navy and is specifically tasked with, *inter alia,* the duties of supervising the provision of all legal advice and related legal services throughout the Department of the Navy, and with providing legal and policy advice to the Secretary on military justice matters. U.S. Navy Regulations, 1990, art. 0331. In addition, the JAG is designated as the Chief of the Judge Advocate General's Corps and, in that capacity, is the principal advisor and sponsor of matters concerned with the officers in the Corps. *Id.,* art. 1009.

The UCMJ authorizes the JAG to perform a variety of functions, which in sum total describe his role in the military justice system as a crucial one. Specifically, under Article 6, assignments of all judge advocates in the Navy, including trial and appellate judges, are made upon his recommendation. Article 6(b) also establishes the right of any staff judge advocate in the field to communicate directly with the JAG. Under Articles 26 and 27, military judges and trial and defense counsel must be certified by him before they can practice in courts-martial, authority that necessarily implies the concomitant authority to decertify. Noted earlier was his mandate to

establish this Court and appoint its judges under Article 66. Article 67 grants him the authority to refer issues of law to the Court of Military Appeals, as does Article 69 with respect to the Court of Military Review. Article 69 also assigns the JAG the responsibility to determine legal and factual errors in all courts-martial which are not subject to review under Article 66. Finally, the JAG is authorized to grant a new trial under Article 73. Furthermore, under departmental regulations, the JAG acts for the Secretary of the Navy in the exercise of many of the latter's powers under the UCMJ. For example, in the name of the Secretary, he grants convening authority status to various commanders pursuant to Article 22(a)(6). JAGMAN § 0115.

From this cursory review of the JAG's statutory and regulatory authority, it is apparent that he is more than an administrative functionary in the military justice system—indeed, he is the linchpin that holds the system together and, most important, the key to its integrity. Congress, as well as the Secretary in the exercise of his statutory authority, has bestowed considerable trust and confidence in the JAG to ensure that the system works as designed: fairly, effectively, and in accordance with the law. It has conferred upon him judicial or quasi-judicial responsibilities in the court-martial arena that require him to stand apart from either party to the case. *United States v. Monett,* 16 U.S.C.M.A. 179, 180 n. 1, 36 C.M.R. 335, 336 n. 1 (1966). Even in the exercise of his administrative functions, he must be fair and even-handed or the overall system of justice in the Na-

---

**5.** We note the absence of any express authority for the JAG to prepare our fitness reports. The Navy and Marine Corps fitness reports directives identify the reporting senior as an officer exercising command authority over the officer concerned. Whether there is a command relationship between the JAG and the Court's judges is not clear, considering the Court's independent status. Article 66 of the UCMJ, as amended by the Military Justice Act of 1968, offers little insight in this regard for it states only that the JAG "shall establish" the Court but says nothing more indicative of a command

relationship. The legislative history of the Act recognizes that he would evaluate trial judges, but no mention is made of appellate judges.

The OJAG Organization Manual describes the Court as a "field activity" of the JAG and states that the Chief Judge "reports" to the JAG. Based on this administrative relationship and the applicability of the JAG's authority over trial judges by analogy as well as the fact that, under Navy Regulations, someone has to submit our fitness reports, we can reasonably conclude that the JAG is the appropriate official to do so.

val Service—*for which he bears considerable responsibility*—will suffer.

With regard to his supervision of military judges in particular, the JAG is duty-bound to preserve their independence if he is to remain true to the congressional intent behind the Military Justice Act of 1968. Indeed, that is precisely why military judges were removed from line control and brought under the direct supervision of the JAG. *Moorhead,* 20 U.S.C.M.A. at 578, 44 C.M.R. at 8; *Ledbetter,* 2 M.J. at 42. Furthermore, the appellate courts have shown no hesitation in emphasizing the duty of the JAG (or his designee) to preserve judicial independence. *United States v. Mabe,* 33 M.J. 200 (C.M.A.1991); *Ledbetter.* In *Graf,* the Court reaffirmed the JAG's obligation in this regard by holding that the use of his power to decertify or transfer a judge based on disagreement with the judge's findings and sentences would violate Articles 26 and 37 of the UCMJ. 35 M.J. at 465.[6] In *United States v. Martinez,* 11 U.S.C.M.A. 224, 29 C.M.R. 40 (1960), the Court found fault as well with a letter written by the JAG to a convening authority which expressed disagreement with the board of review's decision in that case.[7] Finally, the JAGMAN establishes departmental policy that the independence of military judges, unhampered by fear of undue criticism and unswayed by personal interests, will be maintained. JAGMAN § 0165c(1)(a).

## FITNESS REPORTS AND THE LAW

"The lifeblood of any officer's career is his efficiency report." *United States v.* *Hubbard,* 20 U.S.C.M.A. 482, 485, 43 C.M.R. 322, 325 (1971) (Ferguson, J., dissenting). *See also Sanders v. United States,* 594 F.2d 804, 219 Ct.Cl. 285 (1979) (recognizing the importance of the fitness report in an officer's career). In *Hubbard,* the Court addressed the impropriety of a trial counsel endorsing the defense counsel's efficiency report. While expressing concern for the potential conflict inherent in such an arrangement, the Court found no specific prejudice because the defense counsel performed creditably in that case. As indicated by the quote, Judge Ferguson argued in dissent that the defense counsel's inherent conflict of interests in this situation created prejudice *per se.*

In other cases after *Hubbard,* the appellate courts have disapproved of similar situations where a defense counsel opposed an officer authorized to evaluate the defense counsel's performance, calling the situation, in one such case, "wholly inimical to the appearance of integrity of the military justice system." *United States v. Nicholson,* 15 M.J. 436 (C.M.A.1983); *See also United States v. Lodi,* 22 M.J. 184 (C.M.A.1986) *(denying pet. for review)* (Everett, C.J., concurring).

Likewise, the courts have recognized the damage to military justice inherent in the use of the fitness report to punish a member or a witness for his or her role in the court-martial process. *United States v. Deain,* 5 U.S.C.M.A. 44, 17 C.M.R. 44 (1954); *United States v. Littrice,* 3 U.S.C.M.A. 487, 13 C.M.R. 43 (1953); *United States v. Jones,* 30 M.J. 849 (N.M.C.M.R.

---

**6.** *But cf. In re Taylor,* 12 U.S.C.M.A. 427, 31 C.M.R. 13 (1961), in which the Court held that it lacked jurisdiction to review an administrative decision of the Judge Advocate General of the Air Force to decertify a general court-martial law officer. The JAG's action, however, appeared to be unrelated to any particular court-martial or to the subject of judicial independence. In view of the language in *Graf,* noted above, and considering the Court's expansive view of its jurisdiction in matters involving the overall administration of military justice since *Taylor, see McPhail v. United States,* 1 M.J. 457 (C.M.A.1976), we conclude that the Court of Military Appeals would entertain such a petition today if the petitioner could show that an ad-

verse action by the JAG had any apparent effect on the independence of the judiciary.

**7.** The Court's principal concern in *Martinez* was the effect such a letter would have on the convening authority's discretion when he reviewed the findings and sentence anew, as ordered by the board of review. Nevertheless, the case is significant for what it says about the board of review's independence from the JAG's control of its opinions. Another feature of that independence can be found in Article 66(e), UCMJ, which *directs* the JAG to carry out the decisions of the Court, unless he exercises his option to certify the case to the Court of Military Appeals under Article 67(a)(2).

1990). In *Mabe,* the Court made it quite clear that this proscription applies with equal, if not greater, force to fitness reports for military judges. 33 M.J. at 206.

Congress, too, has recognized the potential of the fitness report to subvert military justice. Article 37, UCMJ, prohibits the use of such reports to comment on a member's performance at a court-martial or to punish defense counsel for the zeal with which they represent accused servicemembers. In addition, Article 37 prohibits, by inference, the use of such a report to admonish a military judge for his findings or sentence. *Graf,* 35 M.J. at 465. Similarly, in Article 26, convening authorities are prohibited from using the fitness report to rate a judge on his performance in the courtroom. These same provisions are implemented in the MCM. R.C.M. 104.

While the primary purpose of the fitness report is to identify those officers best qualified for promotion, retention, and assignment to positions of leadership, its use as the primary means to hold officers (including appellate military judges) accountable for their performance of duty and professional conduct is inherent in its nature.[8] It is intended to paint a complete picture of an officer's professional qualifications and character through a combination of objective grading of specific character traits and professional qualities, such as those described earlier in this opinion, and subjective comments in narrative form. One of the most significant entries of any report is the officer's ranking vis-a-vis other officers similarly situated, for he must ultimately compete with his peers for limited promotion and retention opportunities. NAVMILPERSCOMINST 1611.1A.

In conclusion, there is no dispute as to the significance of the fitness report in a judge advocate's career or to the threat that it can pose to the integrity of the military justice system if it is used to subvert the independence of a military judge.

## ANALYSIS

There are three ways to describe and then analyze the appellant's position. First, his argument bears striking resemblance to an allegation that the judges on this Court have been subjected to a form of unlawful command influence, systemic in nature, through the unspoken threat of an adverse fitness report. Second, his assertions, if true, might establish grounds for the judges to disqualify themselves, pursuant to R.C.M. 902 and 28 U.S.C. §§ 144 and 455, based on a "personal" interest in affirming the proceedings below to please the officer who prepares their fitness reports. Third, there is his expressly stated basis— an alleged denial of constitutional due process.[9]

The constitutional due process analysis of this issue seems most appropriate for two reasons. First, it was the means by which the Court of Military Appeals resolved a similar systemic attack based on the lack of fixed terms for judges in *Graf,* 35 M.J. at 455. Second, if the appellant is to prevail in his effort to convince this Court to invalidate the statutory underpinnings of the JAG's authority to prepare the

---

8. We recognize that there are several other means which a senior officer may use to hold his subordinates accountable for their actions. Some are less formal than the fitness report, such as counseling and other non-punitive measures, and some have potentially more serious consequences, such as trial by court-martial. These measures are usually triggered by specific incidents or criteria and are generally discretionary in nature. The fitness report is the only *required, routine* assessment of an officer's strengths and weaknesses.

9. These different frameworks are, of course, interrelated and it is probable that a thorough legal analysis of any of them would lead to the same result as that of any other. We find the unlawful command influence framework not particularly suitable because no specific evidence that the JAG has attempted to influence the Court has been introduced and the case law that has addressed this matter generally requires such evidence to "raise the issue" at the outset. *See United States v. Thomas,* 22 M.J. 388 (C.M.A.1986), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). The same requirement for some evidence of real—as opposed to potential or abstract—personal interest exists to trigger the need for a judge to disqualify himself. *United States v. Kincheloe,* 14 M.J. 40, 50 (C.M.A.1982); *United States v. Allen,* 31 M.J. 572 (N.M.C.M.R.1990).

judges' fitness reports, it would have to be on constitutional grounds.

We begin by noting that the system of military justice which permits the two fundamental principles of judicial independence and judicial accountability to coexist is a creation of the Congress. The UCMJ specifically recognizes the existence of the "military judge," in lieu of the generic term "judge." Inherent in that term is a recognition by the Congress that these officers, like everyone in uniform, would be subject to military orders and professional evaluation, but that these features of military life must not be permitted to interfere with their independence as judges. The balance struck by the Congress between these two potentially conflicting dynamics is clearly reflected throughout the UCMJ, e.g., Articles 6, 6a, 26, and 37, and in the placement of the JAG at the helm to keep the ship of military justice on course. Indeed, the legislative history of the Military Justice Act of 1968 refers to a congressional intent that general court-martial judges be "responsible only to [the JAG] or his designees for direction and *fitness ratings*." S.Rep. 1601, 90th Cong., 2d Sess. 7 (1969), *reprinted in* 1968 U.S.C.C.A.N. 4507–08 (emphasis added). That same balance is an intrinsic aspect of the regulatory scheme established, pursuant to congressional authority, by the President in the MCM and in regulations of the Department of the Navy, to hold military judges accountable as officers and to simultaneously preserve their independence as judges. These regulations reflect, as well, the JAG's obligation to maintain and preserve the "integrity of judicial independence." JAGMAN § 0165(c).

Considering the congressional role described above and the Supreme Court's traditional deference to the Congress in military matters, even those involving constitutional rights, *see, e.g., Solorio v. United States*, 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), we find it appropriate to follow the lead of our superior court in its analysis of the similar issue in *Graf* and apply the test in *Medina v. California*, —— U.S. ——, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992). That test was adopted by the Supreme Court to determine whether a provision of criminal procedure that fell within the peculiar province of state law was constitutionally acceptable. Applied to this case, the *Medina* test is whether the JAG's evaluation in fitness reports of our performance and conduct as appellate military judges "transgresses any recognized principle of fundamental fairness." *Graf*, 35 M.J. at 464. Only if we find that it does can we conclude that the factors militating against the fitness report requirement for judges are so "extraordinarily weighty" as to justify "overcom[ing] the balance struck by Congress." *Graf*, 35 M.J. at 464 (quoting *Middendorf v. Henry*, 425 U.S. 25, 44, 96 S.Ct. 1281, 1292, 47 L.Ed.2d 556 [1976]).

There is no dispute that the appellant's right to have his appeal heard by an appellate tribunal that enjoys decisional independence is a "recognized principle of fundamental fairness." *Graf*. In *Medina* terms, the only question remaining is whether the JAG's preparation of fitness reports for appellate military judges "transgresses" that "recognized principle."

Based upon the matters addressed in the previous sections of this opinion, we make the following observations. First, judicial accountability and judicial independence are not mutually exclusive concepts. *Chandler; Matter Under Investigation*, 783 F.2d at 1509; *Carlucci*, 26 M.J. at 337; *Nash v. Califano*, 613 F.2d at 15. Second, the appropriate official in the Department of the Navy to evaluate military judges and hold them accountable for their performance and conduct is the JAG. Articles 6, 6a, 26, and 66, UCMJ; *Graf; Mabe*. Third, evaluation by fitness report is an authorized and traditional means in the Naval Service to hold officers (including military judges) accountable for their performance and conduct. Fourth, basing a military appellate judge's fitness report on the appropriateness of his opinions and rulings would tend to undermine the independence of that judge.

We conclude from these observations that the JAG's preparation of fitness reports for military appellate judges does not "transgress" the appellant's right to have his appeal heard by an independent judicial

body *if* there are adequate assurances within the military justice system that those reports will not be based upon nor influenced by judicial opinions and rulings.

We find those assurances primarily in two distinct features of the law. First, the law proscribing the use of the fitness report to "punish" a military judge for his findings and sentence, and by inferential extension to the appellate arena for his action on the record, is clear. Article 37, UCMJ; *Mabe*, 33 M.J. at 205. A judge is presumed to know the law and to follow it. *Allen*, 31 M.J. at 602. Likewise, we presume that the JAG, who sits at the head of the judiciary, knows the law and will follow it. Second, the JAG has been assigned, by congressional mandate, the specific duty to ensure that the military justice system operates fairly and impartially and, in particular, to ensure that the *independence of the judiciary is preserved*. In other words, his professional interest in carrying out his duty under the UCMJ and our interest in performing our duty under Canon 1 of the Code of Judicial Conduct are identical. It is obvious to us, and we presume to the JAG as well, that basing fitness report marks and comments on his view of the appropriateness of judicial decisions and rulings would subvert judicial independence and would, therefore, be contrary to his sworn duty.

To be sure, an important aspect of the JAG's interest in the administration of the military justice system is that it operate efficiently, i.e., that it support rather than detract from the operational efficiency of the service. Decisions of this Court which set aside any portion of the proceedings below may impede that efficiency. (On the other hand, such action by this Court would certainly be *more* efficient than forwarding

error-laden cases up the appellate ladder only to see them reversed at a higher rung. *See United States v. Moseley*, 35 M.J. 481, 485 [C.M.A.1992] [Cox, J. concurring]). Yet, to conclude that efficiency is the dominant force that drives the JAG's interest in appellate results—to the detriment of fairness and legal accuracy—is to lose sight of his overall responsibility to see that the military justice system operates fairly and in accordance with the law. An independent and robust appellate judiciary is indispensable to achieving that objective.

Presumably, the same tension between efficiency and fairness that is inherent in military justice exists in federal agencies which employ ALJs to adjudicate matters under their cognizance. Yet, the statutory scheme that balances the decisional independence of ALJs with accountability for non-decisional performance and behavior has passed constitutional muster, notwithstanding the fact that allegations of interference with judicial independence by agency officials have led to considerable litigation. *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. 128, 73 S.Ct. 570, 97 L.Ed. 872 (1953); *Chocallo v. Bureau of Hearings and Appeals*, 548 F.Supp. 1349 (E.D.Pa.), *aff'd*, 716 F.2d 889, *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 360 (1982).[10]

To counter the presumption that the JAG would not violate his duty to preserve the Court's independence through misuse of the fitness report, the appellant offers an affidavit submitted by a former (now retired) Marine appellate judge in which the former judge states that, after his participation in several controversial and high-visibility cases in which convictions were set aside, he received fitness reports from the JAG with comments that can be de-

---

**10.** In one sense, administrative law judges enjoy greater institutional protection from their agency than military judges, because ALJs are not subject to performance appraisals—the federal civil service equivalent of fitness reports. 5 U.S.C. §§ 4301–02. Yet in another, arguably more significant, aspect, they enjoy less. Their opinions on matters of law and agency policy have been held to be "advisory" in nature and subject to agency review, *Association of Admin. Law Judges v. Heckler*, 594 F.Supp. 1132, 1141

(D.D.C.1984), whereas this Court's decisions, unless reversed by a superior court, are binding on the JAG. *Martinez*, 11 U.S.C.M.A. at 227–228, 29 C.M.R. at 43–44; Article 66(e), UCMJ. One federal court has described an ALJ's decisional independence as "qualified." *Chocallo*, 548 F.Supp. at 1369. On balance, ALJs are subject to enough administrative control and accountability to establish the relevance of a comparison between their system and ours to a resolution of this issue.

scribed as "mediocre" at best. Affidavit of Jonathan E. Rubens at 3. Following his tour of duty on the Court, he failed selection for promotion to colonel. The inference drawn by the appellant, and apparently shared by the judge himself, is that he was punished by fitness report because of his appellate decisions. This inference is strongly disputed in affidavits submitted by a former AJAG (who prepared the judge's fitness reports for the JAG's signature, see Affidavit of Charles H. Mitchell at 9–10) and by the former Staff Judge Advocate to the Commandant of the Marine Corps (who, as the senior judge advocate in the Marine Corps, claims familiarity with the former judge's record and his failure to promote to colonel; see Affidavit of Michael E. Rich at 2–3). This factual dispute need not detain us.[11] Just considering the former judge's affidavit alone, we cannot conclude that his fitness reports or his non-selection for colonel was affected in any way by his appellate decisions. There are many other possible explanations for these career set-backs, and we decline to engage in the speculation urged by the appellant.[12]

Although he concedes that it is not *direct* evidence of the JAG's abuse of the fitness report process, the appellant points to the JAG's "record" in recent years in certifying issues to the Court of Military Appeals for review under Article 67(b)(2), UCMJ, as evidence of his prosecutorial orientation, i.e., as proof that he has not exercised his discretionary functions in an impartial manner. That record reveals that virtually all the issues certified under Article 67(b)(2) arose from cases in which the appellants

had been granted some relief by this Court. Even if we were to view this evidence as persuasive proof of the JAG's prosecutorial bent in the certification process, we would still decline to make the quantum leap required to reach the conclusion that he is necessarily compromised thereby in his duty to fairly evaluate the performance of duty and conduct of this Court's appellate judges. However, we need not discuss the absence of a compelling nexus between the two because we do not even accept the premise. The JAG is entitled to present issues of law he deems significant to the Court of Military Appeals. The fact that nearly all the issues presented arose in cases in which the accused was granted relief tells us nothing about his reasons for certifying the particular issues involved, nor, in particular, whether he was necessarily assuming the role of a Government advocate in so doing. We take note of the fact that the vast majority of this Court's decisions which grant relief to the appellants are *not* certified. Without more than raw statistics, we are not inclined to conclude that the JAG has abused the certification process under Article 67(b)(2). *See United States v. Caprio,* 12 M.J. 30, 31 n. 1 (C.M.A.1981).

In the absence of persuasive contrary evidence, we find no valid reason to reject the presumption that the JAG will faithfully carry out his duty to preserve the independence of the judiciary and, in particular, to ensure that fitness reports are not used to subvert that independence. In fact, what little meaningful evidence does exist

---

**11.** In addition to the affidavits noted above, the Government moved to attach copies of the former judge's fitness reports and his petition to the Board for the Correction of Naval Records with appropriate endorsements. This motion was denied by a majority of the Court, who believed that privacy considerations should preclude their inclusion unless they were necessary to a resolution of a disputed question of fact. The majority believed that these documents showed only the mediocre nature of the former judge's reports, a fact already established by the affidavits, and did not shed any light on the central issue, i.e., whether his poor ratings were the result of his judicial decisions.

**12.** It is apparent that the former judge believes he was punished, especially for his participation

in the contentious case of *United States v. Billig,* 26 M.J. 744 (N.M.C.M.R.1988), and in this Court's decision to seek the protection of the Court of Military Appeals against an investigation by the Department of Defense Inspector General into allegations of judicial misconduct related to the *Billig* case. *See Carlucci.* Regardless whether his belief is well-founded, the mere fact that he holds that belief raises concerns about the adequacy of the existing fitness report preparation process to assure judges and other interested parties that there is indeed a sound and lawful basis for evaluation, one that is not related to judicial decisions. *See* nn. 13 and 14 in this regard.

in this case supports the presumption. In an affidavit referred to above, a former AJAG stated that judicial decisions were *not* considered in his preparation of fitness reports for the JAG's signature. Affidavit of Charles H. Mitchell at 8.[13]

On the other side of the fitness report equation are the appellate military judges themselves. Any attempt to subvert independence through the power of the fitness report could only be successful if they were readily susceptible to such influence. Judges, too, are well aware of proscriptions on the use of the fitness report and presumably can find in those proscriptions some assurances that permit them to exercise their discretion unfettered by fear of retribution. Moreover, each appellate judge has a duty himself to resist any intrusion into his decisional independence. ABA Code of Judicial Conduct, Canon 1; *Carlucci*, 26 M.J. at 336. Assuming the JAG were inclined to intrude, we would expect every judge to do his duty and not allow his independence to be compromised. *See Mabe*, 33 M.J. at 207 (Cox, J. dissenting in part and concurring in the result).

Finally, we note that any judge may pursue several means of redress should he receive a fitness report which appears to him to be unlawfully based on decisions favoring appellants. NAVMILPERSCOM-INST 1611.1A; Article 138, UCMJ; 10 U.S.C. § 1552 (Correction of Records); Navy Regulations, 1990, art. 1106. At the same time, we recognize the severe limitations of these means of redress. Retribution by fitness report need not be blatant to be effective. In today's professional atmosphere of intense competition for promotion and retention in the Navy and Marine Corps, even the most subtle shading of grades or narrative comment in a report can signal the end of an officer's march up

the ladder of success. Yet, these subtleties may not provide a sufficient basis for relief through the methods listed above, but, if misapplied, constitute as much a threat to judicial independence as the more blatant variety.

For this reason, we place little reliance on these means of redress as a safety net against the improper use of a fitness report. We rely instead on our conclusion that the JAG's best interest lies in preserving, not undermining, judicial independence and on the presumptions that the JAG will recognize and faithfully execute his duty to preserve our independence and that the judges of this Court will have the integrity and moral courage to steadfastly resist any attempt at undermining that independence.

We recognize that the provisions that preserve judicial independence in the military justice system are not foolproof. No such provisions could be. Inherent in any system of justice that includes measures to hold a judge accountable for his professional conduct is the *possibility* that those measures may be misused to subvert the judge's independence. The military justice system is no exception. However, our analysis of those measures convinces us that this possibility is minimal. We find that there are adequate assurances that the JAG's preparation of fitness reports for military appellate judges does not subvert judicial independence and, in particular, that this appellant has not been denied his right to have his appeal heard by an independent judicial body.

## APPEARANCE OF IMPROPRIETY

Finally, we must address the allegation that, aside from any actual effect on the independence of the Court, the JAG's preparation of our fitness reports creates an

---

**13.** We have not addressed the permissible scope of evaluation available to the JAG concerning the performance of appellate judges if he cannot base evaluations on their decisions regarding the merits of an appeal. We believe that the fitness report directives in the Navy and Marine Corps provide sufficient flexibility to accurately hold a judge accountable for his performance and behavior without undermining his independence in his decision-making capacity. For ex-

ample, judicial demeanor, temperament, industry, collegiality, appearance, military bearing, and adherence to established rules of procedure and ethics, to name a few, are fair areas for evaluation. In the end, this matter is the prerogative of our reporting senior. It is not our place to establish fitness report criteria by judicial fiat as long as the criteria used do not impinge upon a judge's decisional independence.

appearance of unfairness, i.e., that a reasonable observer would conclude that our independence is compromised by this process. Judges must be extremely sensitive to the appearance, as well as the fact, of impartiality. ABA Code of Judicial Conduct, Canon 2; *United States v. Sherrod,* 26 M.J. 30 (C.M.A.1988). The remedy in cases where a judge is faced with facts giving rise to an appearance of bias is to disqualify himself. *Sherrod;* R.C.M. 902(a).

■ Even if we were to find an appearance of bias based upon the latent threat of an adverse fitness report, we would still find this remedy and the case law that addresses judicial disqualification inapplicable to this issue. While the appearance of bias requiring disqualification can arise in a systemic or non-case-specific manner, *see Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1926), if that appearance is based on the *abstract* threat posed by an inherent feature of the system of justice, as it is in this case, without a showing of specific harm, it does not mandate disqualification. *United States v. Graf,* 32 M.J. 809 (N.M.C.M.R.1990). Moreover, *per se* disqualification of all appellate judges on this basis would violate the "maxim of the law to the effect that when all are disqualified, none are disqualified." *Allen,* 31 M.J. at 601.

Although such an appearance would not be dispositive of this issue, nevertheless our obligation under the Canons of Judicial Conduct—to preserve public confidence in military justice—requires that we determine whether it exists and, if it does, to take steps to dispel it. In determining whether such an appearance exists, judges must look, objectively, to what a reasonable observer with full knowledge of the facts giving rise to the question would conclude. *United States v. Berman,* 28 M.J. 615 (A.F.C.M.R.1989).

■ The facts giving rise to this question are the relationship between the JAG and the Court, the JAG's statutory role as the steward of military justice, the provisions that safeguard the independence of the judiciary, and the directives that address the preparation of fitness reports in the Navy and Marine Corps. We assume as well that this informed reasonable observer would be aware of the nature of fitness reports, their importance in the Navy and Marine Corps, and the manner in which they are actually prepared for the JAG's signature. Finally, it is nearly as important to note what would *not* be included in his factual database as it is to consider what is before him. He would have no *convincing* evidence that the JAG has in fact attempted to punish a judge for his decisions or that any judge has been affected by the mere threat of such punishment.

These particulars have been thoroughly discussed above and we find therefrom that a reasonable observer would conclude, as we did, that the JAG's interest lies in preserving, not undermining, the Court's independence, and that any threat arising from the potential for misuse is more abstract than real. To conclude otherwise, that reasonable observer would have to engage in the presumption that the JAG would knowingly violate the law proscribing interference with judicial independence, a presumption no reasonable person would make. In addition, if he were to learn of adverse comments in a judge's fitness report, he would have to speculate that they were the result of the JAG's disapproval of the judge's decisions rather than an assessment based upon lawful grounds. A determination of whether there is an appearance of impropriety should not be based upon speculation and insupportable presumptions. In the end, we find at least a partial answer to the "appearance" question in the fact that the elected representatives of the American public created this system whereby accountable military officers sit as independent judges. If the balance they struck appears fair to them, surely objective onlookers have little cause to complain.

Our inquiry into the appearance aspect of this assigned error does not stop with an assessment of the JAG's role in the fitness report process. Arguably, the method by which the JAG uses his staff to prepare fitness reports for his signature is solely

within his discretion. Yet, if evidence suggests that fitness reports are actually prepared for the JAG's signature by an officer whose interests may be contrary to decisions that favor the appellant, we must look behind the veil to see if that process offends the appellant's right to an independent court. *See United States v. Hilow,* 32 M.J. 439 (C.M.A.1991) (court must examine process by which convening authority detailed members to court-martial to ensure compliance with Article 25, UCMJ).

As disclosed above, fitness reports for appellate judges are prepared in the office of the AJAG. Within the Office of the JAG, this officer "stands in the shoes" of the JAG for military justice matters and, therefore, is duty-bound to ensure that military justice is administered fairly and independently. Presumably, he shares the same interest as the JAG in preserving the Court's independence.

At the same time, the AJAG is responsible, through the Director, Criminal Law Division, for implementing this Court's decisions in the field. Some of those decisions may disapprove service-wide policy previously approved by the AJAG and some could lead to significant change in the way that the military justice system operates in the Navy and Marine Corps. *See, e.g., United States v. Holloway,* 36 M.J. 1078 (N.M.C.M.R.1993) (holding that the Navy's military magistrate program does not comply with *County of Riverside v. McLaughlin,* — U.S. —, 111 S.Ct. 1661, 114 L.Ed.2d 49 [1991]). In addition, we attach meaning to the fact that, organizationally, the appellate judges fall directly under the JAG and, unlike those assigned

military justice duties in the Office of the JAG, judges are not subject to the control of the AJAG. OJAG Organization Manual § 107. For these reasons, although we find nothing *actually* inimical to our independence in this arrangement, arguably a reasonable observer may conclude that it is inappropriate for an officer whose duties do not include supervising the Court's judges, but whose professional responsibilities are so *directly* and *closely* affected by the Court's decisions, to participate in the evaluation of the appellate judges.[14]

For the reasons stated, we find that the appellant has not been denied his right to have his case reviewed by an independent appellate court. We have examined the record of trial and the pleadings and have concluded that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Senior Judges WELCH and JONES concur.

Senior Judge STRICKLAND, concurring:

I concur in the majority opinion and write separately only to set the record straight with respect to the allegations contained in former Senior Judge Mitchell's affidavit that I may have previously formed a conviction that would cause my disqualification in this case. Having never seen Lieutenant Colonel Rubens' fitness reports as a judge on this Court until they were sought to be attached to the record by the Government, I can confidently state that I neither

---

**14.** This opinion is not the place to develop administrative measures to cure an appearance problem arising from the fitness report preparation process. Suffice it to say that we acknowledge that such an appearance may exist, and we urge the Judge Advocate General to examine the process with a view to ensuring that those who participate in it occupy positions less directly affected by the decisions of this Court. In addition, we share Judge Reed's belief, in his concurring opinion, that defining specific criteria for the evaluation of military judges would remove some of the mystery and uncertainty about the process and would lessen the possibility that a judge will leave this Court believing

that he has paid a high professional price for his judicial decisions.

We also invite the JAG's attention to two other aspects of the process that may contribute to an unhealthy appearance: 1) The AJAG is included with the Court's Marine judges for comparison rankings, yet he is the officer who submits recommendations for their reports, and 2) the reviewing officer for Marine judge fitness reports is the Assistant Commandant of the Marine Corps. In our opinion, the latter feature is not consistent with the concept of judicial independence and the inherent conflict in the first aspect tends to detract from the integrity of the fitness report process as a whole.

had nor expressed an abiding conviction that Lieutenant Colonel Rubens had been "screwed" by these reports. What I may well have expressed to former Senior Judge Mitchell was my belief that Lieutenant Colonel Rubens, himself, perceived that he had somehow been harmed as a result of his service as a judge on this Court. Since I have no preconceived convictions concerning any aspect of this case, I conclude that there are no grounds for recusing myself from participation.

Senior Judge FREYER, concurring:

In light of the comments contained in the Government motion to attach the affidavit of former Senior Judge Charles H. Mitchell, I choose to introduce this opinion with some remarks which I deem necessary to set the record straight.

—I have no recollection of having ever been aware of the nature or contents of any fitness reports received by former Judge Rubens for his service as a judge of this Court until I read about them in his affidavit and the Board for Correction of Naval Records application filed with this Court in connection with the instant case. I was, of course, aware of his orders to Panamà, his non-selection for colonel, and *his* abiding conviction that both were due to his involvement in the *Billig–Carlucci* litigation. I had also been told by different people, however, that at least his non-selection for colonel was explainable by other factors relating to his performance in previous assignments. I recall discussing this matter, including *former Judge Rubens'* abiding conviction that his orders and non-selection were in retaliation for his judicial decisions, with former Senior Judge Mitchell on several occasions. I neither had nor expressed any abiding conviction of my own as to the reasons for former Judge Rubens' orders or non-selection, and I have no such abiding conviction now. I do recall expressing some sympathy with the awkwardness of his position, in that the senior trial counsel in the *Billig* case, who, rightly or wrongly, was severely criticized in the majority opinion in *United States v. Billig,* 26 M.J. 744 (N.M.C.M.R.1988), in which Judge Rubens concurred, had become the Head, Judge Advocate Division, Headquarters, U.S. Marine Corps. (This is not to imply that the individual concerned, for whom I have high personal regard, and who has been most helpful to this Court in maintaining our proper manning, acted in any way to Judge Rubens' detriment; I refer simply to the generic awkwardness inherent in such a situation.) In consonance with having an open mind on the issues now before this Court, I certainly considered, and expressed to Senior Judge Mitchell, the *possibility* that official displeasure with the *Billig–Carlucci* litigation might have been, at least to some degree, a contributing factor in former Judge Rubens' overall fate, and I am open to considering that possibility now with respect to his fitness reports as well as the orders and non-selection, if the appellant presents evidence to warrant that conclusion.

—I also recall discussing the matter of former Judge Rubens' orders and non-selection on several occasions with Senior Judge Strickland, including former Judge Rubens' abiding conviction that his orders and non-selection were in retaliation for his judicial decisions. I have no recollection of Senior Judge Strickland's ever mentioning former Judge Rubens' fitness reports as a judge of this Court. At no time did Senior Judge Strickland express or otherwise evince to me, or to anyone else in my presence, a conviction, abiding or otherwise, that Judge Rubens' fate was due to his involvement in the *Billig–Carlucci* litigation, and our discussions left me with the general impression that he did not believe that.

—I also recall discussions among myself, former Senior Judge Mitchell, and other judges of this Court concerning the fates of the 0–6 judges who participated in the *Billig–Carlucci* litigation and were considered and selected by Selective Early Retirement Boards. These discussions were inconclusive as to what, if any, part their involvement in that litigation may have played in their selection for early retirement. I neither had nor expressed any abiding conviction concerning the reasons for their selection, and I have no such

conviction now. I did, and do, deplore the *appearance* that arose from the selection of former judges of this Court who participated in the *Billig* decision for early retirement, even though I have been told by people who knew them that their selection was explainable on other grounds, and even though I personally disapproved of portions of the *Billig* opinion (as distinguished from the decision, itself, concerning which I have insufficient knowledge on which to base an opinion).

—In light of the foregoing, and after considering the authority cited by appellate Government counsel, I perceive no grounds for recusing myself from participation in this case.

Having said that, I concur generally in the majority opinion because I believe that it not only correctly states the law as it is but also follows the approach used by the U.S. Court of Military Appeals in *United States v. Mabe*, 33 M.J. 200 (C.M.A.1991) (*Mabe [C]*) and *United States v. Graf*, 35 M.J. 450 (C.M.A.1992). I also concur in the separate opinions of Judges Reed and Mollison, because they add thoughtful dimensions to the problem, and I share their thoughts, except that I view the Assistant Judge Advocate General for Military Law (AJAG) as the *alter ego* of the Judge Advocate General (JAG) and, therefore, no more or less qualified to be involved in judicial fitness ratings than the JAG, himself. It should be noted that the terms JAG and AJAG may be used to refer to both positions and the individuals occupying those positions at any particular time. I interpret the majority opinion to be using these terms to refer to the positions, themselves. If an incumbent of either position adopts an *unduly* partisan, pro-Government

stance, the presumptions on which the majority opinion entirely depends vanish, along with its conclusions, as long as that incumbent is involved in the rating process.

I view this case and *Mabe [C]* as closely related, at least on a theoretical level. In a sense, the underlying assumption of all the opinions in this case is that it would be improper for a reporting senior of appellate judges to base their fitness ratings on the reporting senior's like or dislike for, or agreement or disagreement with, their decisions and rulings. Since, as in *Mabe*, there is nothing in any statute or regulation which expressly so provides, I conclude that this underlying assumption derives from whatever the U.S. Court of Military Appeals read between the lines of Articles 26 and 37 in *Mabe [C]* and propagated in *Graf* with respect to tenure.

The *Mabe/Graf*" "solution" necessarily assumes that the JAG, his designee, and the AJAG are sufficiently disinterested, or at least possess sufficient integrity and equanimity, to give fair ratings without regard to their personal preferences or reactions to findings, sentences, and rulings, if told by the U.S. Court of Military Appeals that they must do so. My primary objective in writing the concurring opinion in *United States v. Mabe*, 30 M.J. 1254 (N.M.C.M.R.1990) (*Mabe [N]*), was to stimulate discussion about the effects on judicial independence of a system in which trial judges are rated by the JAG's or their designees in light of the JAG's' varied responsibilities, some of which I characterized at that time as being "akin to those of attorneys-general and [involving] complex and subtle relationships to the line components of their services." 30 M.J. at 1274.[1]

---

1. Perhaps the correct analysis of this issue in a system such as ours requires that appearances of conflict be judged by a different standard when they arise from a practice or relationship which the Congress, themselves, have created, expressly or at least by implication. The U.S. Court of Military Appeals have recognized that staff judge advocates and convening authorities act in a prosecutorial capacity before trial and in a judicial (reviewing) capacity *in the same case* after trial, *United States v. Fernandez*, 24 M.J. 77 (C.M.A.1987). I cannot imagine that civilian due process would tolerate the civilian

analogue of such a practice, and there is no way that an appearance of conflict can be dispelled, as the legislative history of the U.C.M.J. demonstrates; yet, notwithstanding the appearance of conflict, the practice is sanctioned as compatible with *military* due process because the Congress have specifically legislated it, and situations of demonstrated actual bias on the part of staff judge advocates and convening authorities are dealt with on a case-by-case basis. My concurrence in the APPEARANCE OF IMPROPRIETY section of the majority opinion is based on

What I had, therefore, hoped for from the *Mabe [C]* opinion was that it would thoughtfully analyze the concept of rating trial judges by the JAG's or their designees, discuss the propriety of assigning grades in "judgment," "analytical ability," and "organizational support," or at least define how such grades might properly be assigned, and either mend the system within the limits of U.S. Court of Military Appeals authority or call for appropriate legislation (hence, the reference to "the complacency that would result from a less than comprehensive restructuring" near the end of the *Mabe [N]* concurrence, 30 M.J. at 1276). Because the opinion that emerged in *Mabe [C]* was very different, those issues remained unresolved and have now erupted at the appellate level.

The U.S. Court of Military Appeals' approach to those issues was clarified to some degree in *Graf.* As I understand the opinion in *Graf,* it holds:

(1) that the Uniform Code of Military Justice (U.C.M.J.) does not provide for tenure for military judges;

(2) that the Due Process clause of Amendment V to the United States Constitution does not require that military trial or appellate judges be granted tenure;

(3) that, absent such a constitutional requirement, the U.S. Court of Military Appeals lacks the power to override the Uniform Code of Military Justice so as to provide for tenure by judicial fiat; and

(4) that whatever it was that *Mabe [C]* found between the lines of Articles 26 and 37, U.C.M.J., to render impermissible the rating of military trial judges on their findings and sentences likewise precluded the decertification or transfer of military trial or appellate judges on the basis of the JAG's' opinions of their findings, sentences, or rulings.

If the U.S. Court of Military Appeals apply the *Mabe/Graf* approach to this case, as I expect, they will merely hold that reporting seniors of appellate military judges are prohibited from basing the latters' fitness reports on the formers' like or dislike for, or agreement or disagreement with, the judges' opinions and rulings. Judges who believe that such limitation has been transgressed will be referred to the Board for Correction of Military/Naval Records and Article 138 or, perhaps, be invited to file a petition for extraordinary relief in the U.S. Court of Military Appeals.

The *Mabe/Graf* approach, which I take to define the law we must follow, leads inexorably to affirmance in this case, and I consider the majority and other opinions addressing the issues in this case, taken together, to comprise an appropriate vehicle for arriving at that result. Accordingly, I concur in them all, subject to the qualifications noted *supra.*

My concern with this disposition, however, as with the dispositions in *Mabe [C]* and *Graf,* is that it is almost wholly lacking in any practical mechanism for preventing, detecting, or remedying violations. Unless a reporting senior is clumsy enough to insert objectively prohibited comments in the narrative section of a fitness report, the report can be made virtually inscrutable. The Board for Correction of Military/Naval Records and Article 138 are useless in such cases, as acknowledged in other opinions in this case and as explained in former Judge Rubens' affidavit (aside from the merit or lack of merit of his own application for relief). As I pointed out in the *Mabe [N]* concurrence:

> Moreover, whereas, in the past, nearly all circuit judges had already attained the grade of 0–6, many now are, or shortly will be, 0–5's competitive for 0–6 in a highly selective environment, who understand perfectly that, with respect to their own fitness reports, the least adjustment in the rankings or slightest nuance in a narrative could make the difference between selection and passover.

30 M.J. at 1275. As it turns out, that may have been an understatement, for I was once informed by a member of a selection board which considered an officer on whom I had written fitness reports that those reports, which I had intended to be superlative, were deemed less so because key

this analysis, which I do not particularly like but believe is probably the law.

phrases in the superlative comments I had written were not underlined. The truth is that the Board for Correction of Military/Naval Records and Article 138 simply are not calibrated to respond to nuances and codes which are instantly recognizable by selection boards, and anyone seriously concerned with judicial independence needs to understand this.

As mentioned previously, once opinions and rulings are placed off-limits, it is unclear on what the letter marks in "judgment," "analytical ability," and "organizational support" are supposed to be based. This problem is closely related to the serious problem of the lack of objective rating criteria identified in other opinions in this case, and both problems share the inscrutability feature of the fitness report issue previously addressed.

In fairness, it must be acknowledged that, as held in *Graf*, where the Congress have established a procedure, courts are limited in invalidating that procedure to infirmities of constitutional dimension. Moreover, the *Mabe/Graf* approach parallels the measure adopted by the Congress, themselves, in Article 37 with respect to members, that is, merely placing certain areas off-limits to reporting seniors, while leaving the members at the mercy of the same reporting seniors in other areas. A search of the legislative history of that addition to Article 37 in the Military Justice Act of 1968 has failed to disclose any discussion regarding its probable efficacy.

The old (and quaintly gender-specific) fitness report form, NAVPERS 1611/1 (Rev. 12–69), contained a marking category called "moral courage," which it defined as "To do what he ought to do regardless of consequences to himself." When all is said and done, that is what was required of a military trial or appellate judge before *Mabe* and *Graf*, and it is equally required now. As desirable as moral courage may be, however, the presupposition that there should be adverse consequences to oneself for doing what one ought to do suggests that something is wrong. The administrative framework in which the military judiciaries operate should promote judicial independence affirmatively, not by taxing the moral courage of the judges to compensate for adverse structural conditions, which, by their very existence, create a perception of judicial self-interest in the outcome of decisions among the judges themselves, accused, and members of the public.

If, in this case, the *Mabe/Graf* approach was adopted with resignation as the best that could be achieved judicially under the present statutory scheme, that would be one thing; but, if it was put forward as a solution, that would be quite another, for it would then pose a grave risk of generating the very "complacency that would result from a less than comprehensive restructuring" warned of in the *Mabe [N]* concurrence, which could delay meaningful reform for years.

Judge MOLLISON, with whom Senior Judge ORR and Judge LAWRENCE join, concurring in part and concurring in the result:

I concur in the Chief Judge's analysis of the due process aspect of the principal issue, but I concur in Judge Reed's analysis of the command influence aspect. This case fortuitously is the vehicle for airing an important issue respecting the relationship between the Judge Advocate General and the officers appointed by him to this Court. The principal assignment of error concerns the delicate balance to be struck between congressionally authorized JAG supervision of the Court and congressionally mandated independence of the Court. I strike the balance as follows: Unless the rating and ranking of appellate military judges is accomplished by the Judge Advocate General based on clearly stated criteria applicable to their unique, independent function in the military (and only with the assistance of persons having no arguable interest, official or otherwise, in the outcome of cases before the Court), military appellate review will not enjoy the confidence in its integrity and independence that Congress and the public require. Means currently exist to redress palpable, individual instances of command influence, and those means promote confidence in the integrity of the appellate process. The current rating/rank-

ing system breeds claims of subtle, systemic command influence no less worthy of concern. One can only speculate what politically charged cases may come before military appellate tribunals in the future and how their integrity and independence will be tested. But now is the time to remove the lingering doubts the current rating/ranking system fosters.

Judge REED, concurring in the result:

I concur with the result of the majority opinion affirming the findings and sentence, as approved on review below. Additionally, I do not believe that any due process rights of this appellant have been violated. However, I write separately to express my own views on the issue raised by appellant concerning the fitness reports written on the judges of this Court. I believe appellant has raised an allegation that this Court is subjected to a form of command influence and that this allegation should be addressed. I discuss the Judge Advocate General's (JAG) supervisory role over this Court and conclude that such a role is permissible but limited. I also conclude that the Assistant Judge Advocate General (Military Justice) (AJAG) as the JAG's designee may have a role in this Court's supervision, but because of the appearance of a conflict of interests inherent in the AJAG's roles and missions and the way the Office of the AJAG operates, the role must be filled by the JAG himself. Finally, while unlawful command influence might, in some cases, be perceived, it does not appear in appellant's case, and I determine he has suffered no prejudice.

I.

BACKGROUND

To provide background for a discussion of the issue, I would make the following findings of fact, in addition to those contained in the majority opinion:

The AJAG has primary supervisory responsibility for the performance of the Judge Advocate General's statutory duties in all military justice and related matters as authorized in the Uniform Code of Military Justice (UCMJ) (10 U.S.C. §§ 801–940), the Manual for Courts–Martial, 1984 (MCM, 1984) and the Manual of the Judge Advocate General (JAG Manual). He also serves as the Officer in Charge (OIC), Navy–Marine Corps Appellate Review Activity (NAMARA).[1] Falling under him in his role as the OIC are the Appellate Defense Division and the Appellate Government Division.[2] As the OIC, NAMARA, the AJAG writes the fitness report for the Appellate Defense Division Director, a Navy Commander, O–5, and for the Appellate Government Division Director, a Marine Corps Colonel, O–6.[3]

I judicially note the following: The AJAG is attached to the Office of the Judge Advocate General of the Navy. The Navy and Marine Corps Appellate Judges are attached to NAMARA.

The Office of the Judge Advocate General of the Navy is in the executive part of the Department of the Navy. 10 U.S.C. § 5148(b). The Judge Advocate General of the Navy performs his duties under the direction of the Secretary of the Navy. 10 U.S.C. § 5148(d).

The Judge Advocate General of the Navy is assigned to the staff of the Chief of Naval Operations (CNO) as Special Assistant for Legal Services, and is tasked to advise and assist the CNO in formulating and implementing policies and initiatives pertaining to the provision of legal services within the Navy. JAGINST 5400.1A, § 102.b. Additionally, the JAG exercises, for CNO, centralized coordination of the provision of legal services by the Naval Legal Service Command and other judge advocates; effects liaison with the Commandant of the Marine Corps concerning legal service matters of mutual interest to the Navy and Marine Corps; and maintains liaison, for the CNO, with other DOD components, other government agencies, and

---

1. Judge Advocate General Instruction (JAGINST) 5400.1A of 6 July 1992, § 107.

2. *Id.*

3. Information provided to this Court, *en banc,* during oral argument, 23 March 1993.

agencies outside the Government on legal service matters affecting the Navy. JAG-INST 5400.1A, § 102.b.

I believe few are aware of how all-encompassing the JAG's role is, not only in military justice matters, but in personnel actions which affect both trial and appellate judges; the personnel actions are invariably driven by fitness reports. A general knowledge of such involvement is important in discussing the issue of possible command influence through the use of such reports.

A Judge Advocate General has sat on a Commander to Captain promotion board;[4] has sat on boards convened to select Navy JAG Corps officers for involuntary early retirement;[5] has sat on boards convened to recommend to the Secretary of the Navy the appointment of a Marine Corps officer to serve as the Director, Judge Advocate Division, a general officer (0–7) billet and the senior lawyer in the U.S. Marine Corps;[6] has sat on a promotion board to recommend to the Secretary of the Navy that a Marine Corps judge advocate be assigned as the Assistant Judge Advocate General of the Navy (Military Justice) and be eligible to retire as a general officer, with the rank, grade, and pay of such pursuant to 10 U.S.C. § 5149(c);[7] has detailed Navy judge advocates to sit as the Assistant Judge Advocate General eligible to retire as a flag officer pursuant to 10 U.S.C. § 5149(c); and details judge advocates to this Court, upon recommendation of a screening board,[8] and upon termination of such assignments, approves the reassignment of Navy judges to other billets within the Judge Advocate General's Corps, unless such judge retires.

II.

## POSTURE OF THE CASE

"The Uniform Code of Military Justice confers upon the Judge Advocate General [and the AJAG, his designee,] independent judicial or quasi-judicial responsibilities which are so substantially separated from the mainstream of prosecution that it is at least arguable that his office stands separate and apart from either party to the case." *United States v. Monett,* 16 U.S.C.M.A. 179, 180 n. 1, 36 C.M.R. 335, 336 n. 1. If such is true, and I believe it to be, the JAG or the AJAG must accord each party to a military justice proceeding the same respect and the same even-handed treatment that the other receives, regardless of the issue presented. If the AJAG, as the JAG's designee and the supervisor of both the Appellate Government and Appellate Defense Divisions, treats or appears to treat the parties differently or apparently accords one side favoritism to the detriment of the other, the overall system of military justice suffers. As a result, and not unexpectedly, one party might well allege prejudice, as has occurred here.

I note for the record that appellate defense counsel has been consistently thwarted in her efforts to obtain information or discovery in this case through the efforts of the Appellate Government Division and presumably the personnel assigned to the Office of the AJAG. The Appellate Government Division has claimed attorney work-product privilege for papers forwarded to the JAG requesting that the JAG certify issues to the Court of Military Ap-

---

**4.** At least one of this Court's former judges, an officer in the grade of 0–5, failed selection to the grade of 0–6 subsequent to his assignment to this Court. Furthermore, in the past, one sitting judge of this court failed to select for 0–6.

**5.** In the past, at least one of this Court's sitting judges has been selected for involuntary early retirement, although not on a board in which the JAG participated.

**6.** *See* 10 U.S.C.A. § 5046 (West Supp.1992). At least one of the former judges of this Court has gone on to serve as the Director, Judge Advocate

Division, serving as a brigadier general and retiring as such.

**7.** At least two of this court's former judges were subsequently assigned as the AJAG (Military Justice) and were retired in the grade of brigadier general.

**8.** JAGINST 5817.1 of 18 Nov. 1991 Subj: Judicial Screening Board. "The report of the Board is advisory in nature and does not restrict whatsoever the statutory authority of the Judge Advocate General to make judicial appointments." JAGINST 5817.1 ¶ 4g.

peals; appellate defense attorneys, on the other hand, note that their requests for information/certification to the JAG are routinely routed through the Appellate Government Division for comment. Appellate Government Division personnel and personnel attached to the office of the AJAG have generally refused to be interviewed concerning the way that office handles military justice matters, mostly matters of a non-confidential nature; the AJAG has used Appellate Government Division personnel to draft replies to requests from appellate defense counsel; and Appellate Government Division personnel have sought a protective order from this Court to keep Government personnel, including the AJAG and his deputy, from being interviewed.[9] While the lawyers assigned to the Appellate Government Division are expected to be advocates, to maintain the needed appearance of impartiality, the AJAG as the JAG's designee should be above such tactics. As a result of the above, appellant claims a *perceived* bias by the AJAG in favor of the Government.[10] I must concur. However, such a perception of bias is relevant in the case before us only as it relates to matters reflecting on the independence of this Court and as raised in the assignment of error. I believe

it has relevance considering, as I discuss later, the AJAG's role in submitting recommended fitness reports on appellate judges to the JAG.

### III.

### DISCUSSION

Marine Corps Order P1610.7, para. 6006.2 of 19 March 1988, provides that

[t]he reporting chain for a Marine Corps judge advocate assigned to perform duties as a military [trial] judge will be as defined in applicable military judiciary instructions. Fitness reports shall conform to the general policies described in this Manual and instructions provided by the Judge Advocate General of the Navy, the Chief Judge of the Navy–Marine Corps Trial Judiciary, or the Chief Judge of the U.S. Navy–Marine Corps Court of Military Review.

No such order or instruction exists for appellate military judges, with the result that it is unclear as to what reporting chain exists for appellate judges. In the absence of such an instruction, the criteria used for reporting on Marine Corps appellate judges must be the criteria which apply generally to all Marine Corps officers as listed in the Marine Corps fitness report order itself.[11]

---

**9.** This Court denied that request and eventually ordered the AJAG to respond to inquiries requested by appellate defense. Had appellate defense pursued the matter and established relevancy and necessity, requests for further interrogatories of the AJAG and the JAG would have been considered by me.

**10.** Defense has been thwarted in any reasonable effort, outside judicial decree, to obtain information. Most of the facts revealed in this case result from disclosure by this Court. Facts were revealed by the AJAG (Military Justice) only after an order of this Court and then with a preface to the Government's perplexity over "this Court's support for this frivolous litigation."

**11.** As military judges it is difficult for us to understand what criteria are used to evaluate us. We are aware of the fitness report orders but have received no explanation of how those criteria are used to report on us as members of the judiciary.

I also observe that little is known outside the Court, itself, of the work of individual judges, and Article 66(g) of the UCMJ prohibits anyone who is in the best position to evaluate those

things usually associated with assessing someone else's performance from participating in the process. Those measures of performance noticeable to anyone outside the Court are essentially those few published opinions (and for someone particularly close to military appellate work, unpublished opinions) that are individually subscribed. Those few published opinions for some judges may represent only 2 or 3 percent of the cases he or she is assigned as lead judge and 1 percent or fewer of those cases in which that judge actually participates. For other judges, the percentages may be far less, and the frequency of unpublished opinions that are individually attributed is hardly more than a few percentage points higher than for published opinions.

In the last six bound volumes of the Military Justice Reporter (volumes 30 through 35), encompassing approximately the last 3 years, this Court has published fewer than 200 opinions. Volume 29 contains *no* NMCMR decisions. The workload of this Court during any *one* of those 3 years has been in excess of 3000, if not 4000, cases.

Consequently, the work of an appellate judge on this Court visible to the outside observer is a

Certainly, there is doubtful authority, as the majority opinion recognizes, for the Assistant Commandant of the Marine Corps to act as the Reviewing Officer on fitness reports for Marine Corps appellate judges.

The Navy fitness reports are governed by NAVMILPERSCOMINST 1611.1A. Nothing within that instruction specifically addresses fitness reports for either appellate or trial court judges.

## PROPRIETY OF THE JUDGE ADVOCATE GENERAL SUBMITTING FITNESS REPORTS ON MILITARY JUDGES

■ The purpose of the Military Justice Act of 1968, Pub.L. 90–632, 82 Stat. 1335, was in part to

> redesignate appellate boards of review as 'courts of military review' and change somewhat their structure, to increase the independence of military judges and members and other officials of courts-martial from unlawful influence by convening authorities and other commanding officers, and to increase the post-conviction safeguards and remedies available to the accused.

S.Rep. No. 1601, 90th Cong., 2d Sess. 3 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4501, 4503–04.

The legislative history of the 1968 Act indicates, at least as far as the trial judiciary is concerned, an

> intent ... to provide for the establishment within each service of an independent judiciary composed of military judges certified for duty on general courts-martial, who are assigned directly

to the Judge Advocate General of the service and are responsible only to him or his designees for direction and fitness ratings.

*Id.* at 4507–08. However, unlike the language dealing with trial judges, there is neither a codal provision nor any expression in the legislative history of the Military Justice Act of 1968 to indicate congressional intent that appellate judges be assigned to the JAG for their "direction and fitness ratings." "The purpose of the amendment was to provide a single appellate body for the review of court-martial cases within each service, to improve and enhance the stature and independent status of these appellate bodies, and to provide for sound internal administration within these courts of military review." *Id.* at 4515. The legislative history and the testimony before Congress urging the passage of the Military Justice Act of 1968 make clear that the judges of the courts of military review and the military trial judges were to be part of an independent judiciary, responsible only to the Judge Advocate General. Although the UCMJ and the legislative history of the 1968 Act are silent as to either the JAG or the AJAG using fitness reports to report on appellate judges,[12] the legislative history is clear that the Judge Advocate General was to play a prominent role in ensuring the independence of the trial and appellate judiciaries.

Appellate defense counsel argue that it is through this very role of protecting the independence of the judiciary that the JAG exercises control or is perceived as exercis-

---

mere fraction of what that judge actually does. That visible fraction tends to be cases that may be more noteworthy or controversial because of the holding.

12. Section 2(27) amends article 66 (boards of review) by redesignating the boards as "courts of military review" and by directing each judge advocate general to establish a single court of military review in the place of the "one or more boards of review" provided for in the present article 66(a).... *The purpose of the amendment is to provide a single appellate body for the review of court-martial cases within each service, to improve and enhance the stature and independent status of these*

*appellate bodies, and to provide for sound internal administration within these courts of military review.*

S.Rep. No. 1601 at 4514–15 (emphasis added). Congressman Philbin in his report to the House of Representatives on the Military Justice Act of 1968 (H.R. 15971) noted

> The bill changes the name of the intermediate appellate agencies in the military from boards of review to courts of military review. The bill requires that the judges of these courts and the military judges of courts-martial be part of an independent judiciary, responsible only to the Judge Advocate General.

114 Cong.Rec. 23, 30564 (1968).

ing control over the appellate courts.[13] He does this, the argument goes, through the use of fitness reports.

The majority opinion today notes that an analysis of the current case under an "unlawful command influence framework [is] not particularly suitable because no specific evidence that the JAG has attempted to influence the Court has been introduced and the case law that has addressed this matter generally requires such evidence to 'raise the issue'." However, the Court of Military Appeals has not limited such inquiry to cases only where there is "specific evidence."

If anything is clear in the Uniform Code of Military Justice, it is the congressional resolve that both actual *and perceived* unlawful command influence be eliminated from the military justice system. Article 26(c)'s provision for an independent trial judiciary responsible only to the Judge Advocate General certainly was not designed merely to structure a more complicated conduit for command influence. That is to say, the Judge Advocate General and his representatives should not function as a commander's alter ego but instead are obliged to assure that *all* judicial officers remain insulated from command influence before, during, and after trial.[14]

**13.** This concern needs to be considered in light of the JAG's overall role in assignments, promotions, and other personnel matters.

**14.** The Court of Military Appeals noted in *Ledbetter* that the appearance of judicial tampering could be eliminated by congressional action to provide some form of tenure for all judges in the military justice system. *See United States v. Ledbetter*, 2 M.J. 37, 43 n. 12 (C.M.A.1976).

**15.** Military judges at the trial or appellate level have a

sworn obligation to perform their judicial duties—this obligation existing both under their oaths as military officers and under their oaths as judges. The first Canon of Judicial Conduct requires that judges uphold the independence and integrity of their courts. ABA Code of Judicial Conduct, Canon 1 (1972). When, in 1968, Congress changed the title "law officer" to "military judge" and "board of review member" to "appellate military judge," *see* Pub.L. No. 90–632, §§ 2(8)

*United States v. Ledbetter*, 2 M.J. 37, 42 (C.M.A.1976) (emphasis and footnote added).

I note, as did Judge Cox in his separate opinion in *United States v. Mabe*, 33 M.J. 200 (C.M.A.1991):

Canon 1 of the ABA Code of Judicial Conduct includes this very simple statement, "An independent and honorable judiciary is indispensable to justice in our society." A judge who lives by the Code cannot be unlawfully influenced by outside pressures.[15] A good judge will accept criticism, reflect upon it, and hopefully render the best judgment possible, uninhibited by the dangers which lurk if his judgment does not please the community in which he must function.

*Mabe*, 33 M.J. at 207 (Cox, J., dissenting in part and concurring in the result) (footnote added). I agree that a good judge will function to the best of his or her ability without any regard to outside influence. However, the discussion following Canon 1 adds: "Deference to the judgments and rulings of courts depends upon public confidence in the integrity *and independence* of judges. The integrity and independence of judges depends in turn upon their acting *without fear or favor*." (Emphasis added.)[16]

and 2(27), 82 Stat. 1336, 1941, it certainly intended that military judges would be subject to this Canon—which is applicable to all other judges throughout the United States. Indeed, for Congress to name someone a "judge" and not intend for him to perform his duties as a "judge" would be to perpetrate a fraud on servicemembers and on the American public. It follows that a military judge—whether at the trial or appellate level—who fails to uphold the independence and integrity of his court is guilty of dereliction of duty and has violated the Uniform Code.
*United States Navy–Marine Corps Court of Military Review v. Carlucci*, 26 M.J. 328, 336 (C.M.A. 1988).

**16.** Anecdotal stories exist concerning former judges who believe their careers may have been adversely affected by service on this Court. The affidavit of a former judge submitted by appellant is one such example. The importance of the affidavit is not whether this judge's career was affected by his tour on this Court but his belief that it was.

Although addressing a different level of review, the Court of Military Appeals has said: "The accused's entitlement to an impartial post-trial review ... is a substantial right and the critical first step on the appellate ladder. He is entitled to the completion of this stage without the possibility that it was influenced by the opinion of superior authority." *United States v. Martinez*, 11 U.S.C.M.A. 224, 227, 29 C.M.R. 40, 43 (1960).

The Court of Military Appeals has gone to great lengths to ensure not only the impartiality of this Court but also to ensure that there is no appearance of partiality. In *United States v. Rojas*, 17 M.J. 154 (C.M.A.1984), appellant complained that a senior judge of one of this Court's panels used notes from the Government lawyer who argued the case in preparing the Court's opinion. In returning the record of trial for a new review before a different panel, the Court of Military Appeals noted that even if the notes played no part in the panel's decision, "at the very least, such action impairs confidence in the military appellate process. Whether, as here, in a capital case or in any other case, an appellant is entitled to every assurance that no *hidden or unknown* influence will play a part in the outcome of his appeal." *Rojas*, 17 M.J. at 155 (emphasis added).

Having said this, the Court of Military Appeals has not prohibited the use of fitness reports. In *Mabe*, the Court recognized that fitness reports could be written on trial judges by the Chief Trial Judge and by the Judge Advocate General of the Navy but limited the areas that legitimately could be commented upon:

We state again today that the fitness-report system cannot be used as a conduit for command complaints against judge-alone sentencing. We also conclude that the majority of the court below committed no legal error in finding for this reason that the Garvin Memorandum [directed at a circuit judge supervised by Judge Garvin and which noted that the recipient judge's circuit was a circuit of preference in sentencing for servicemembers accused of being unau-

thorized absentees] constituted command influence.

33 M.J. at 206.

While prohibiting such comments in a fitness report written on a circuit judge, nevertheless, the Court of Military Appeals allowed the Chief, Navy–Marine Corps Trial Judiciary, to provide comments to the JAG, which were then used by the JAG in a report on the trial judge that could, at best, be characterized as average. *See United States v. Mabe*, 30 M.J. 1254, 1261 n. 2 (N.M.C.M.R.1990) (en banc). This Court did go on to say in that footnote that the input from the chief trial judge did not address matters of in-court judicial discretion.

It should be noted that

[t]he enactment of the Uniform Code of Military Justice eliminated the requirement that The Judge Advocate General participate in action by the board of review. With respect to their decisions, his function is now purely administrative, and he must be content to accept their conclusion or to exercise his authority under ... 10 U.S.C. § 867, to certify the decision to [the Court of Military Appeals].

*United States v. Martinez*, 11 U.S.C.M.A. at 228, 29 C.M.R. at 44. I submit that this line of decisions also limits those matters the JAG can legitimately consider or comment on in submitting fitness reports on military appellate judges.

The majority opinion in this case notes that any judge may pursue several avenues of redress should he receive a fitness report which intrudes on his judicial independence. However, as also pointed out in the majority opinion, these avenues of redress may be of little value in repudiating "subtle shading of grades or narrative comment in a report," or even a mediocre ranking on a fitness report. Such reports influence promotions, assignments, and involuntary retirements. I concur with the majority's view that *generally* the JAG's best interest lies in preserving judicial independence. At times, however, the JAG's and the military leadership's concerns may be contrary to those of the Court, as in *United States*

*v. Kossman,* 37 M.J. 639 (N.M.C.M.R.1993) (upholding continued viability of 90–day pretrial confinement rule of *United States v. Burton* ); *United States v. Holloway,* 36 M.J. 1078 (N.M.C.M.R.1993) (en banc) (applying *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 [1991] to pretrial confinement in the Naval Service); and *United States v. Watson,* 35 M.J. 602 (N.M.C.M.R.1992) (en banc) (holding post-trial actions invalid where convening authority's responsibilities transferred without following secretarial regulation). In some cases, these concerns are in direct conflict, i.e., *United States Navy–Marine Corps Court of Military Review v. Carlucci,* 26 M.J. 328 (C.M.A.1988) and *United States v. Billig,* 26 M.J. 744 (N.M.C.M.R.1988) (en banc).

So what is the role of the JAG vis-a-vis this Court? Although few, the Federal cases dealing with this subject are enlightening.[17] In *Chandler v. Judicial Council,* 398 U.S. 74, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970), the Chief Judge of the U.S. District Court for the Western District of Oklahoma filed in the U.S. Supreme Court for leave to file a petition for a writ of mandamus or prohibition addressed to the Judicial Council of the Tenth Circuit, which had entered various orders depriving the petitioner of the assignment of cases filed in the District Court. The Supreme Court denied the motion. The petitioner had sought relief from the Circuit Judicial Council's temporary order finding petitioner had failed to efficiently discharge his duties and directing that the petitioner was to take no action in any case in the district. The order was entered under 28 U.S.C. § 332, which authorizes each judicial council to make necessary orders for effective administration of the business of the courts within its circuit, and was subsequently modified to allow the petitioner to act on cases currently pending before him.

Following the *Chandler* decision, the U.S. Court of Appeals for the Eleventh Circuit stated:

The *Chandler* Court, to be sure, drew back from attempting to define the permissible extent of a circuit council's administrative powers. Thus it never ruled expressly whether Judge Chandler's colleagues went too far in refusing to assign him further cases until he had coped with his backlog. The Supreme Court also made it plain that court management powers exercised by a judge's colleagues could be unconstitutional if they amounted to an undue burden upon the independence of an individual judge.... Nonetheless the Court indicated that for "a complex judicial system [to] function efficiently," judges are entitled to *some* degree of "statutory framework and power whereby they might 'put their own house in order.'"

*Matter of Certain Complaints Under Investigation,* 783 F.2d 1488, 1505 (11th Cir. 1986) (alteration in original) (citations omitted).

As for the argument "that courts are mere collections of individual judges, each of whom is a complete law unto himself or herself," *id.,* the Eleventh Circuit rejected that notion and stated:

The majority in *Chandler* indicated that there was no constitutional obstacle to the broadly worded grant of authority to judicial councils, and that the judges of a court could take reasonable management actions affecting all judges *provided they were not violative of each judge's essential independence in respect to decision-making....*

*Id.* (emphasis added). The Court continued:

The key to the disagreement between the *Chandler* dissenters and the majority may well lie in the fact that whereas the dissenters saw the realm of judicial independence to be all-encompassing, the majority located a judge's protected independence, more narrowly, "in deciding cases or in any phase of the decisional function." The Court continued, "[I]t is quite another matter to say that each

---

**17.** The Court of Military Appeals has held that Federal practice applies to court-martial procedures if not incompatible with military law or with the special requirement of the military establishment. *See United States v. Knudson,* 4 U.S.C.M.A. 587, 591, 16 C.M.R. 161, 165 (1954).

judge in a complex system shall be the absolute ruler of his manner of conducting judicial business."

*Id.* at 1506–07. While *Chandler* did not decide how far a judge's colleagues might go in the pursuit of administrative goals, it indicated that Congress has some leeway in this area.

In *Territorial Court of the Virgin Islands v. Richards,* 847 F.2d 108 (3d Cir. 1988), the Territorial Court, an Article I Court, brought action against the Department of the Interior seeking a declaratory judgment and arguing that the authority to audit the Territorial Court resided in the Administration Officer of the United States Courts and not in the Inspector General of the Department of Interior. The Territorial Court, created by the Territorial legislature pursuant to powers granted by an act of Congress, argued that permitting an executive agency to audit a judicial body would violate the constitutional principle that the legislative, executive, and judicial branches are independent and co-equal branches of the government. Citing article IV, § 3, cl. 2, of the U.S. Constitution, the Third Circuit gave short shrift to this argument and, without any reference to the *Chandler* decision, stated they were "unwilling to find such a constraint on Congress in its relations with the territories of the United States." 847 F.2d at 112.[18]

I would conclude from these decisions as well as those by the Court of Military Appeals that the judges of this Court, a creation of Congress, are no more free from all supervision and intervention than are other Federal judges. The question remains, however, whether, if neither actual bias is shown as in the case before us nor even the "appearance of impropriety," the JAG is precluded from any involvement in the evaluation of appellate judges. I think

the clear answer is that he is not. As I read the authorities cited above, the role of the Judge Advocate General is to protect the independence of the judicial system. Clearly, federal and military authorities decry any interference in the judicial decision-making process. While interference is impermissible for the JAG, other areas of possible supervision and administration are not. Appellate military judges are military officers; in addition to their judicial duties, they also have military responsibilities which are compatible with those duties. A fitness report may certainly be used to report on these other military responsibilities.[19]

The AJAG, however, should play no role in the evaluation of appellate judges. As noted, the AJAG is *the* person primarily responsible for the performance of JAG's statutory duties in all military justice and related matters under the UCMJ, the MCM, 1984, and the JAG Manual. As such, his time is devoted almost exclusively to military justice matters. Certainly a great deal of his work is driven by opinions of this Court. Decisions like *Holloway, Watson, Kossman,* and others, can only increase the workload of AJAG personnel and potentially contradict positions the AJAG may have taken on exactly the same issue in advice or recommendations to the JAG. Not only is the daily work of the AJAG intertwined with the decisions of this Court, the AJAG is himself compared and graded against those very appellate judges. At least an appearance of a conflict of interests arises when the AJAG is asked to submit draft reports on appellate judges, not only whose opinions directly affect the performance of his job but also who are rated against him.

Although the AJAG's duties are constantly intertwined with military justice

---

18. The majority, in its analysis, attempts to draw parallels between the military justice system and the system dealing with administrative law judges. I do not find the analogy helpful. A defendant has much more to lose—his liberty and, in some cases even his life—than a respondent in an administrative proceeding.

19. Such responsibilities might include personal appearance in uniform, physical conditioning, temperament, efficiency, productivity, etc. In this regard it might be helpful to elicit comments from military judges, the Association of American Judges, the American Bar Association, and others.

matters, the JAG's arguably are not.[20] Thus, when the JAG needs input on the performance of appellate judges he logically turns to the person he has designated as responsible for military justice matters, the AJAG. However, because of his own interest in the outcome of the fitness report system and his possible disagreement with opinions from this Court, in submitting recommendations the AJAG is placed in an untenable and possibly compromising position.[21]

The Chief Judge, Navy–Marine Corps Trial Judiciary, and the Chief Judge, U.S. Navy–Marine Corps Court of Military Review, are each ranked alone and compared to no other;[22] such is called a one-of-one report. The stated rationale for doing this is that it would be unfair for other trial judges or appellate judges to be ranked against their Chief Judge because they would always come out second best. The same can be argued as the reason against comparing the AJAG against the Marine Corps judges of the Court of Military Review.[23]

While it has been said that the Marine Corps regulations currently in effect require the AJAG to be rated against the CMR judges, I do not read the regulations as requiring such a result. *See* MCO P1610.7C of 4 Nov. 85 (Marine Corps Performance Evaluation System). When this grouping of judges with the AJAG for reporting purposes is added to the present system of allowing the AJAG to prepare suggested fitness reports on the judges of this Court and considering the AJAG's perceived bias in favor of appellate government counsel as noted above, any argument that the AJAG is impartial is unpersuasive. Removal of the AJAG from the ranking structure of judges and precluding any fitness report recommendations by him would obviate what appears to me to be a clear conflict of interests.

From the above perhaps too lengthy discussion, I conclude that:

(1) Interference in or comment on the judicial decision-making process or the consideration of the outcome in particular cases by the JAG, or the AJAG as his designee, in a fitness report or in any other manner is impermissible.

(2) In order for an appellate judge to be properly evaluated by the JAG in a fitness report, specific objective criteria must be developed, specifically excepting judicial decision-making process;[24] such has not been done and, to the extent that criteria currently being used violate this principle, such criteria should no longer be used;

(3) The practice of ranking appellate judges should be discontinued. In the absence of specific objective criteria, "an objective, disinterested observer fully informed of the facts would entertain a significant doubt that justice was being

---

**20.** An argument posited by some on the validity of the JAG writing reports on appellate judges is his impartiality because of his distance from the military justice scene. Two factors augur against this position of neutrality: (1) information on military justice matters is filtered by the AJAG on the way to the JAG—as explained earlier, the AJAG is not necessarily impartial; and (2) although the JAG arguably spends only a small amount of time on military justice, the military matters he spends time on are the high visibility, high profile cases in which the senior leaders of the Naval Service have an interest.

**21.** Some may argue that the only impact that a fitness report has on a judge is whether a judge makes flag or general officer rank. More is at stake than that. Junior judges hope for a coveted follow-on tour; 0–5's hope to make 0–6 (although there are no 0–5's on this Court today

there have been in the past and the Army routinely assigns 0–5's to its Court); 0–6's hope to avoid involuntary selective early retirement if they are not ready to retire; Marine 0–6's may seek the AJAG (Military Justice) billet which in the recent past has allowed an 0–6 to retire as an 0–7; etc.

**22.** This fact as to the Chief Judge of the trial judiciary was admitted by the Government in its oral argument before this Court.

**23.** It is judicially noted that the Assistant Judge Advocate General (Civil Law), the counterpart of the AJAG (Military Justice), is rated by the JAG, as one-of-one, and compared against no other for fitness report purposes.

**24.** Logic, analytical ability, knowledge, loyalty, et al, should be excluded as criteria.

done" [25] and would perceive an appearance of command influence.

As for this appellant, I conclude that he has not been prejudiced. While an allegation of command influence, including the appearance of command influence, may legitimately be raised in an appropriate case, and may carry the day and mandate reversal, appellant's is not such a case.

I do not believe that any reasonable person could possibly conclude that the JAG, or any other person or party in a position to exert influence on the judges of this Court, would have any particular interest in appellant's case. Pursuant to his pleas, appellant was found guilty. He specifically requested a bad conduct discharge at trial. He has raised no specific error to this Court other than a general attack on its judges. He has posited no possible reason that the JAG or the AJAG would have any interest in him. I thus would affirm the findings and sentence as approved on review below.

---

25. *United States v. Berman,* 28 M.J. 615, 616–18 (A.F.C.M.R.1989).